**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SAMMY MOORE, | : | |
| | : | Civil Action No. 04-2337 (WHW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ROY L. HENDRICKS, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

Petitioner pro se                    Counsel for Respondents
Sammy Moore                          Steven Jay Kaflowitz, Esq.
New Jersey State Prison              Assistant Prosecutor
P.O. Box 861                         Union County
Trenton, NJ 08625                    Administration Building
                                     32 Rahway Avenue
                                     Elizabeth, NJ 07207

**WALLS**, District Judge

Petitioner Sammy Moore, a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondents are Roy L. Hendricks and the Attorney General of New Jersey.

For the reasons stated herein, the Petition must be denied.

## I.   BACKGROUND

Petitioner was convicted of first degree murder, N.J.S.A. 2C:11-3a(1); first-degree attempted murder, N.J.S.A. 2C:11-3a(1) and 2C:5-1; two counts of first-degree robbery, N.J.S.A. 2C:15-1;[1] first-degree felony murder N.J.S.A. 2C:11-3a(3); second-degree conspiracy, N.J.S.A. 2C:5-2; second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a; third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b; and third-degree receiving stolen property, N.J.S.A. 2C:20-7.  Defendant was sentenced to life imprisonment with a thirty-year parole disqualifier on count one, to a consecutive term of twenty years with a ten-year parole disqualifier on count two, and to concurrent terms of twenty years with a ten-year parole disqualifier on counts three and four, ten years with a five-year parole disqualifier on count seven, and five years with a two and one-half year parole disqualifier on counts eight and nine.  The felony murder conviction was merged into the first-degree murder conviction, and the conspiracy conviction was merged into the two robbery and the possession of a firearm for an unlawful purpose convictions.

---

[1] Petitioner's conviction of first-degree robbery upon Keith Staple (count four) was reversed by the Appellate Division and is not at issue here.

2

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[2]

According to the testimony at trial, a jury could reasonably have found as fact that on the evening of Saturday, December 4, 1993, defendant and four companions[fn omitted] drove from Newark to Plainfield planning to commit armed robbery. According to Alexander Walker, a friend of both defendant and codefendant Tariq Diggs, during the day of December 4, 1993, Diggs asked Walker if he wanted to go "sticking;" that is, if he wanted to go rob someone. Later that day, Walker saw defendant in the company of codefendants Tariq Diggs, David Diggs, and a person Walker identified as "the driver." The driver was from Plainfield and his car was a white Hyundai Elantra. Soon thereafter, Tariq Diggs again asked Walker if he wanted to join him. Walker declined.

At approximately 9:00 p.m., defendant was seen by Traci Thomas in Newark, at the apartment of Brenda Johnson. Also at the apartment that evening were Alexander Walker and codefendant Tariq Diggs. Although on direct examination Thomas could not recall whether defendant left the apartment with these two codefendants, on cross examination she said that all three left together. Thomas also said on direct examination that defendant left "[a] little while after" he arrived.

Defendant and codefendants then left for Plainfield. After driving around in Plainfield, they stopped for a while to speak to a few girls. There was testimony indicating that it was between 8:00 p.m. and 9:00 p.m. when the group from Newark first met these girls in Plainfield. The boys were in a white Hyundai Elantra. Defendant was identified as being one of the people who spoke with these girls. We note the

_____

[2] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. the applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

discrepancy between the time defendant had been placed in Plainfield and Traci Thomas' testimony that defendant was still in Newark at 9:00 p.m., but the jury was free to find that the times were not exact, and minor time discrepancies could be disregarded.

The Newark group returned to speak to the girls between 11:00 p.m. and midnight. They drove up to the girls' home and blew their car's horn. However, the girls remained inside. The Newark group then drove off.

At some time between midnight and 1:30 a.m., Kyewaghanna Cook and her cousin, Khahlia Hassenbey, two of the girls from Plainfield who had seen defendant there earlier in the evening, were walking to a club when they again saw the white Hyundai Elantra. The car was parked near the intersection of South Second Street and Morris Avenue. Cook saw three or four boys get out of the car, and of these, she recognized one as defendant. Hassenbey recognized all the boys as the same people she had seen earlier in the evening. Hassenbey also said that one of them had a "big" gun, but she was not sure which one that was. The boys walked toward the intersection of Morris Avenue and West Third Street. The white car pulled away, driving in the opposite direction.

The girls continued walking, and about five minutes later heard about six gunshots. The girls then ran, apparently toward the direction of the shots. They saw a man running down the street calling for help and saying he had been shot. The man then fell in the street and held his chest. After calling the police, the girls continued walking. They then came upon Marcus Benjamin, already shot.

Marcus Benjamin had been selling drugs that evening (Saturday, December 4, 1993) with the help of two boys, Keith Carson and Quan Collier. Benjamin had been a drug dealer for five or six years. Also, he had purchased a blue 1986 Honda Accord automobile around September 1993. Shortly before the shooting, Collier had given Benjamin approximately $1000 in profits. Benjamin had put the money in the trunk of his car, which was his habit with large sums of money.

4

Testimony indicated that the shooting itself took place early on the morning of December 5, 1993 as follows:  Some or all of the group from Newark, all but one of whom were masked, approached the two victims, Marcus Benjamin and Keith Staple (a passerby). Testimony indicated that all of the Newark group were armed.  The one unmasked gunman was identified by Carson as codefendant James "Jimbo" Baines, a person who lived one block from where the shooting took place and who used to sell drugs on the block where the shooting occurred.

The victim Keith Staple testified that early in the morning of December 5, 1993, he was walking on Third Street in Plainfield toward a girlfriend's house. He was standing on the sidewalk when he heard the shuffling of feet behind him and turned to his left. He saw three people, two of whom were wearing ski masks.  The third person was covering his face with "a pretty big gun."  Staple froze because he thought these people were going to rob him.  As he told them that he did not have anything for them to take, a gun was placed in his left ear.  The robbers were going through Marcus Benjamin's pockets at that point.  The gun was then removed from Staple's ear and placed above his waist on the lower right portion of his back.  A car was started and the gunman pushed Staple away.  Staple turned, saw the gunman firing the weapon, and was shot in the chest.  Staple turned around, and was shot again, this time in the right bicep.  Staple then ran toward an adjoining street.  After this, Benjamin was shot and killed, and his blue Honda Accord was taken from the scene.

During this incident, nothing was taken from Staple, and no demand was made upon him.  He also testified that no one went through his pockets and that no one even tried to take anything from him.

At some point in the early morning of December 5, 1993, defendant returned to Brenda Johnson's apartment and again spoke with Traci Thomas.  Alexander Walker was again with defendant, although codefendant Tariq Diggs was not there.  At that time, Thomas testified, defendant told her that he had shot two people and that he had money and a car.  Defendant also told her that he planned to sell the car, which was then parked in front of Johnson's apartment building.

5

Shaye Walker, a friend of defendant's, testified that in the early afternoon of Sunday, December 5, 1993, she saw defendant, who told her that he and others had gone to Plainfield, shot someone, and taken that person's car. Defendant did not tell her who specifically did the shooting. Defendant also told her that he planned to sell the car.

Walker also testified that in the past she had seen defendant with a handgun. Additionally, she stated that she had been a party to a three-person telephone conversation where she assumed defendant asked the third person, Tanton "Shorty" Venerable, what happened with a gun, to which Venerable responded, "I took care of it." Defendant also may have said that if the police could not find the gun, they would have no proof. However, she also said that she really was not sure what this conversation was about, and suggested that it could have been about drugs.

Later on the afternoon of December 5, 1993, at around 3:30 p.m., defendant brought the blue Honda Accord to the home of his friend Luciana Wellman in Orange. Defendant explained that he had purchased the car from someone in Plainfield and asked Luciana to hold the car's papers. He also told her it was his aunt's car. Luciana's mother, Elizabeth Wellman, returned from the movies at about 4:00 p.m. that day to find defendant and another person watching a football game with her daughter. Defendant asked Elizabeth if he could leave the car at her house overnight because he had just gotten it from his aunt and he did not want to leave it in his neighborhood in Newark, where lots of cars were stolen, until he could get the "papers right on the car." She told defendant he could not leave the car there, even though he denied that it was stolen. Nevertheless, defendant left the car at the Wellmans' house.

After defendant left, Elizabeth Wellman called the police about the car. They determined that the car had belonged to the murder victim. It was then traced to defendant and he was arrested.

In the meanwhile, after Luciana Wellman was told by her mother that the car was stolen, Luciana telephoned her friend Natasha Lavant. Lavant testified that the next morning, December 6, 1993, she found

defendant and confronted him about the car.  He told Lavant that she and Luciana should pretend that they did not know him so that they would not get in trouble. Defendant also told Lavant that, as she said, "There was a body attached to [the car]."  She asked him what he meant by this, and he responded by saying first that "he" had shot someone, and then that "they" had shot someone.  Defendant was very nervous and was mumbling incoherently to himself.

At trial, a police officer read aloud the entire eight-page statement he had taken from defendant.[footnote omitted]  In the statement, defendant explained in some detail the events leading to his shooting of the two men.  He also admitted stealing the blue Honda Accord.

Defendant testified in his own behalf, denying any involvement in this incident.  He stated that he was in Newark all night from December 4, 1993 to the morning of December 5, 1993.  He denied ever telling anyone that he shot someone in Plainfield.  Defendant explained his possession of the blue Honda Accord that had belonged to Marcus Benjamin by claiming that he purchased it that day, Sunday, December 5, 1993, for $1000 from "Snoop."  Snoop is a "traveler," someone who would find you when he had something to sell but would could not easily be found, at least not by defendant. Defendant planned to fix up the car, which he did not know was stolen when he bought it.  He said that he took the car to Luciana Wellman's home because he thought it would be safer there than in Newark. Defendant also testified that he gave the statement in which he confessed to the crimes because, he said, he was scared as a result of threats the police had made to him.  He thought that the police would find out he was innocent after they talked to Snoop.

(Resp. Ex. Ra1 at 2-9, Opinion of Appellate Division, Apr. 10, 1997.)  The Appellate Division affirmed in most respects, but remanded to the trial court for a hearing on one issue, whether the trial court should have granted an adjournment to give the

defense an opportunity to produce two alibi witnesses, and retained jurisdiction following the hearing on remand.

On remand, the trial court conducted a hearing as to whether the alibi witnesses had been subpoenaed and as to what their testimony would have been. (Resp. Ex. Ra 27, Tr. of April 29, 1997.) The trial court found that the witnesses had not been subpoenaed, (Resp. Ex. Ra27 at 62), and that the witnesses were not credible and would not have been dispositively helpful to Petitioner, (id. at 62-64). On reinstatement of the appeal, by Order filed July 31, 1997, the Appellate Division agreed with the trial court's conclusions and affirmed the conviction. (Resp. Ex. Ra2.) On October 21, 1997, the Supreme Court of New Jersey denied certification. (Resp. Ex. Ra8.)

Petitioner timely filed a motion for post-conviction relief, which was denied. (Resp. Ex. Ra28.) The Appellate Division affirmed, (Resp. Ex. Ra13), and the Supreme Court of New Jersey denied certification, (Resp. Ex. Ra17). This Petition followed. Respondents have answered, and Petitioner has filed a reply. This matter is now ready for disposition.

## II. 28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an

8

application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determinated by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court

either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other

10

federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).]

11

III.   ANALYSIS

A.   Admission of Confession

Petitioner argues that the trial court should not have admitted his second statement to police, in which he confessed. The Appellate Division rejected this claim.

> Defendant next asserts that the judge should not have ruled admissible his second statement to the police, in which he admitted to shooting two men, because the circumstances surrounding this statement indicate that it was not given voluntarily. He asserts that the judge's findings were not made on credible evidence in the record and thus should be overturned.
>
> Before the commencement of the trial, the judge held a Miranda hearing. At that hearing, a Plainfield officer testified as to the circumstances under which he twice gave defendant Miranda warnings, how defendant both times waived those rights, as well as the circumstances relating to defendant's confession. Defendant testified that at his second interrogation he was told that although his alibi was confirmed, it was not what the Plainfield police wanted to hear. Thus, he was "forced" to sign a typewritten statement that day confessing to the crime. He was told that if he did not sign, the officers interrogating him were going to make sure defendant got the death penalty and that "girls" defendant knew would be locked up and their children placed in foster homes. Defendant testified that he eventually signed the false statement because he "got tired of them raggin on me and kept making me say something I did but I didn't do. So I got tired of it and just went along with it." Regarding a diagram defendant drew that day of the crime scene, defendant said he only drew it based on what he saw the officers drawing. Thus, according to defendant, the officers drew the diagram and defendant merely copied it. All the information given that day, both in the statement and on the diagram, was attributed by defendant to information given to him by the officers.
>
> Where the State asserts that a defendant has waived his constitutional rights, the State bears the burden of proving the defendant did so "voluntarily,

12

knowingly and intelligently." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 684, 707 (1966). ... "The State must prove that a defendant has waived his <u>Miranda</u> rights by proof beyond a reasonable doubt before a confession is admissible in evidence." ... We, however, "give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case...." ...

Here, the judge made the requisite finding, following the pretrial hearing, that the waiver and statement were given voluntarily. Specifically, he stated:

> I find it inconceivable that somebody who is threatened with the death penalty would confess to a murder thereby giving the State all the ammunition [it] need[s]....
>
> ....
>
> I find the testimony of the [Plainfield police officer] to be credible evidence in this case and don't believe that based upon the totality of the circumstances here that ... Mr. Moore's recollection of the event is accurate. I find the rights were given to him. He was asked to read them aloud. Asked to read them to himself. Asked to initial them. Evidence of the fact that they were given to him. He understood them. Asked to sign the waiver which was read aloud and signed on both occasions.
>
> Therefore, the statement was made [after a] knowing, voluntary and intelligent waiver of his rights and is admissible in this trial.

The judge thus found that the State met its burden of showing that defendant waived his <u>Miranda</u> rights beyond a reasonable doubt. We defer to this finding, including the finding of credibility. ...

(Resp. Ex. Ra1 at 15-.)

13

Pursuant to the Fifth Amendment to the United States Constitution, "No person ... shall be compelled in any criminal case to be a witness against himself ... ."  In Miranda v. Arizona, the Supreme Court of the United States held that:

> when an individual is taken into custody or otherwise
> deprived of his freedom by the authorities in any
> significant way and is subjected to questioning, the
> privilege against self-incrimination is jeopardized.
> Procedural safeguards must be employed to protect the
> privilege and unless other fully effective means are
> adopted to notify the person of his right of silence
> and to assure that the exercise of the right will be
> scrupulously honored, the following measures are
> required.  He must be warned prior to any questioning
> that he has the right to remain silent, that anything
> he says can be used against him in a court of law, that
> he has the right to the presence of an attorney, and
> that if he cannot afford an attorney one will be
> appointed for him prior to any questioning if he so
> desires.  Opportunity to exercise these rights must be
> afforded to him throughout the interrogation.  After
> such warnings have been given, and such opportunity
> afforded him, the individual may knowingly and
> intelligently waive these rights and agree to answer
> questions or make a statement.  But unless and until
> such warnings and waiver are demonstrated by the
> prosecution at trial, no evidence obtained as a result
> of interrogation can be used against him.

384 U.S. at 478-79 (footnote omitted).

A waiver may be made orally or may be implied from a suspect's conduct.  See North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Cruz , 910 F.2d 1072, 1080 (3d Cir. 1990), cert. denied, 498 U.S. 1039 (1991).  To introduce into evidence a suspect's statement made during custodial interrogation, the government must establish, by a preponderance of the evidence, a voluntary waiver of Miranda rights.  Colorado

14

v. Connelly, 479 U.S. 157, 168-69 (1986).  This is a rule of constitutional dimension, violation of which may justify issuance of a writ of habeas corpus.  See generally Dickerson v. United States, 530 U.S. 428 (2000).

> Once warnings have been given, the subsequent
> procedure is clear.  If the individual indicates in any
> manner, at any time prior to or during questioning,
> that he wishes to remain silent, the interrogation must
> cease.  At this point he has shown that he intends to
> exercise his Fifth Amendment privilege; any statement
> taken after the person invokes his privilege cannot be
> other than the product of compulsion, subtle or
> otherwise.  Without the right to cut off questioning,
> the setting of in-custody interrogation operates on the
> individual to overcome free choice in producing a statement after the

Miranda, 384 U.S. at 473-74.  A defendant's right to cut off questioning must be "scrupulously honored."  Michigan v. Mosley, 423 U.S. 96, 103-04 (1975).

"The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.  But ... '[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'"  Dickerson, 530 U.S. at 444.

"[T]he ultimate issue of 'voluntariness' is a legal question requiring independent federal determination," and is thus not subject to the § 2254(d) presumption of correctness.  Miller v. Fenton, 474 U.S. 104, 109-110 (1985).

> The Supreme Court has made clear that a statement
> is involuntary when the suspect's "will was overborne

15

in such a way as to render his confession the product
of coercion." <u>Arizona v. Fulminante</u>, 499 U.S. 279, 288,
111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining
whether a statement is voluntary, Supreme Court
precedent requires consideration of "the totality of
all the surrounding circumstances--both the
characteristics of the accused and the details of the
interrogation." <u>Dickerson v. United States</u> , 530 U.S.
428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)
(quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226,
93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These
surrounding circumstances include "not only the crucial
element of police coercion, <u>Colorado v. Connelly</u>, 479
U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986),"
but may also include "the length of the interrogation,
its location, its continuity, the defendant's maturity,
education, physical condition, and mental health."
<u>Withrow v. Williams</u>, 507 U.S. 680, 693, 113 S.Ct. 1745,
123 L.Ed.2d 407 (1993) (some internal citations
omitted).

<u>Lam v. Kelchner</u>, 304 F.3d 256, 264 (3d Cir. 2002).  "[S]ubsidiary

questions, such as the length and circumstances of the

interrogation, the defendant's prior experience with the legal

process, and familiarity with the <u>Miranda</u> warnings, often require

the resolution of conflicting testimony of police and defendant.

The law is therefore clear that state-court findings on such

matters are conclusive on the habeas court if fairly supported in

the record and if the other circumstances enumerated in § 2254(d)

are inapplicable."  <u>Dickerson</u>, 474 U.S. at 117.

"This totality of the circumstances approach is adequate to

determine whether there has been a waiver even where

interrogation of juveniles is involved." <u>Fare v. Michael C.</u>, 442

U.S.707, 725 (1979).

Here, the trial court conducted an evidentiary hearing to determine the voluntariness and admissibility of the confession. (Resp. Ex. Ra19, Tr., Dec. 12, 1994.)   The factual record created in state court compels the conclusion that the confession was voluntary and admissible.   The trial court found the interrogating officer's testimony to be credible.   The trial court found that Petitioner was advised of his <u>Miranda</u> rights and that he understood them.   The Appellate Division deferred to the trial court's findings.   Petitioner is not entitled to relief on this claim.

B.   <u>Due Process in Trial Procedure</u>

Petitioner contends that the trial court should have adjourned the trial to permit the defense to produce two alibi witnesses.   This issue was the subject of a remand from the Appellate Division on direct appeal and an evidentiary hearing by the trial court.

> Defendant first claims that he was improperly prevented from producing two alibi witnesses.   During a break on the last day of testimony, defendant's attorney informed the judge that two witnesses subpoenaed to testify for the defense had failed to appear.   An investigator from the public defender's office had told defense counsel that the subpoenas had been served.   Counsel told the judge that one of the people had been arrested the night before and the other was most probably attempting to secure the release of the first person.   Counsel represented to the judge that these witnesses would place defendant in Newark until between 11:00 p.m. and midnight on the night in question.   Counsel argued, "I feel that [the] testimony is significant since the State's witnesses have

indicated that [defendant] was seen in Plainfield as
early as nine o'clock on the evening in question."

The judge rejected this request, stating:

> I don't find the testimony at all
> significant in view of the fact that the
> alleged murder took place at a period of time
> where even if he was there until midnight, he
> had plenty of time to drive to Plainfield and
> commit the murder.  The testimony is not
> dispositive.  I will not grant your request
> to adjourn this case.  This case was put on
> the calendar for a long time.

Further, defense counsel did not have proof of
service, and the judge said, "If you don't have proof
of service, your motion is definitely not being
granted." [footnote omitted]  However, contrary to
defendant's contention, the judge did not relate his
denial of this request to his earlier statement that he
wanted to finish the trial that day because he had a
full sentencing calendar the next day.  Defendant
claims that the judge's refusal to grant an adjournment
"constituted an abuse of discretion and deprived
defendant of a fair trial."

Clearly, the decision to grant an adjournment is
discretionary.  ...  Therefore, this court must examine
whether the judge mistakenly exercised that discretion.
...  Further, "refusal of an adjournment will not lead
to reversal absent manifest wrong or injury to the
defendant by reason of such refusal."  ...  In
addition, "[i]t is generally held that testimony to an
alibi in a criminal case is of so material a nature
that, if the absence of a witness who will give such
testimony is properly presented, a continuance should
be granted."  ...

Although both defendant and the State agree on the
applicable law, disagreement comes over its proper
application.  Defendant points to his constitutional
right to present a defense, including the right to call
witnesses, and claims the adjournment should have been
granted to protect these rights.  Defendant notes that
if the jury had found he was in Newark until midnight,
the jury would have had to discredit the identification
of defendant by the girls in Plainfield, including Cook

and Hassenbey, as one of the people who got out of the
white car to talk to them.  Testimony had placed
defendant and the others in Plainfield at between 8:00
p.m. and 9:00 p.m., and then again at between 11:00
p.m. and midnight.

. . .

    The question, then, is whether the judge's
decision not to carry the case for another court day or
two inflicted on defendant "manifest wrong or injury."
. . .  [T]he proofs against defendant in the present case
were strong.  However, defendant's argument concerning
the relevance of the testimony has merit, and therefore
the refusal to allow the adjournment may have been
significantly harmful.  If defendant could have proven
he was wrongly identified earlier in the evening, then
he might have cast doubt on the later eyewitnesses'
identifications of him.

    We, however, have not lost sight of either
defendant's confession or the damning statements
allegedly made to the Newark witnesses after his
return.  . . .  We have determined that [remand] is the
best solution.  . . .  [I]f the court determines, based
upon the totality of the proofs, that the witnesses
would not have materially aided defendant's case, then
the new trial motion should be denied.

(Resp. Ex. Ra1 at 9-15.)

    At the hearing on remand, alibi witness Brenda Johnson

testified that Petitioner had been in her apartment "in and out"

all day before the offenses took place, and that she left the

apartment at around midnight and did not return until around 3:00

a.m.  She testified that Petitioner was at her apartment when she

left and when she returned.  (Resp. Ex. Ra27 at 14-20, Tr. of

April 29, 1997.)  She was shown conflicting testimony from her

appearance before the grand jury, which she said she did not

recall.  (Resp. Ex. Ra27 at 30-31.)  Witness Brenda Johnson

further testified that she and Petitioner refer to one another as brother and sister and consider one another like family. (Resp. Ex. Ra27 at 31.)

Alibi Witness Ebony Bennett testified that she shared an apartment with Brenda Johnson, and that Petitioner had been "in and out" of their apartment all day before the offenses took place. She testified that she went to bed between 11:00 p.m. and midnight, that Petitioner was in the apartment when she went to bed, and that she next saw Petitioner around 10:00 a.m. the next morning. (Resp. Ex. Ra27 at 37-43.)

The trial court found that the alibi witnesses would not have materially aided the defense.

> With regard to Brenda Johnson, I disagree with Mr. Russo in terms of this Court's inability to judge credibility in this situation. I find her to be an incredible, incredible witness. Her Grand Jury testimony, sworn statements given at another opportunity, even if the Rules of Evidence were guiding this hearing and they probably don't, would completely neutralize her testimony in this case and the jury would have been so instructed. This is a very good friend of the defendant who considered him like family and has visited him in prison and obviously would do anything she can in her mind to try to assist the defendant.

> On the other hand, she is not even an alibi because as the Appellate Division noted there are discrepancies in times but there is a period of three hours where at worst -- at best for the defendant he was not within her sight and she had no idea what he did because she went out partying and if you believe her other testimony, there were periods of time during the night for an hour to an hour and a half that he may have been outside of her presence and could have gone to Plainfield. So she was not a very dispositive

"alibi witness" nor one that would compel this Court to conclude that the fact that she did not testify deprived the defendant of his constitutional right to due process under the circumstances of this case.

The last witness, Ebony Bennett, went to bed at 11 o'clock and didn't see him until the next night.  We have a whole evening where he could have been doing anything.  That is not a good alibi witness and, further, her testimony is extremely weak.  She testified she didn't know what she did on December 1st, 2nd or 3rd but when pressed on December 4th, oh, yeah, suddenly she does remember specifics and I don't think any reasonable trier of fact could conclude that her testimony was nothing more than what she thought probably happened on that date because this is the way she spent her days, sitting in front of a television set with people coming in and out of the apartment.

... Now we have confirmed what my two and a half decades of trial experience suggested at this trial.  One, that the witnesses were not subpoenaed and, two, even if they had been, there testimony was not dispositively helpful to the defendant.

...

Furthermore, Detective Marcantonio testified at trial that he interviewed defendant's alibis.  The defendant gave him names of certain alibi witnesses on the night in question and they did not confirm the defendant's alibis and once the defendant was told about it, he admitted his responsibility for the shooting.

... The defendant admitted that he was the only person with the gun in his eight-page confession.  He admitted that it was loaded with six live rounds of .44 caliber ammunition.  He admitted that he shot the fat kid in the back and he shot the guy he was holding; that he fired the gun three times; that he threw the gun out of the car window as they returned to Newark; that he told somebody else that night that he shot two people in Plainfield.  Well, there is no need to go on but suffice it to say that this was one of the strongest cases I have ever seen.

21

> Now [I have] done what was requested by the
> Appellate Division and I repeat that which I stated at
> trial, the witnesses who testified here are not
> material to the defendant's defenses. In fact they are
> potentially damaging if we are going to have additional
> testimony that the defendant was out clocking on the
> night in question. So we know that was blurted out by
> this witness. If she blurted it out at the time of
> trial, that wouldn't have been very helpful to the
> defendant and, indeed, damaging.
>
> This testimony was not significant to the defense
> and contrary to the apparent concerns of the Appellate
> Division, the defendant did not suffer a manifest wrong
> or injury from my ruling at trial on this issue.

(Resp. Ex. Ra27 at 62-66.)

On reinstatement of the appeal, the Appellate Division

agreed with the trial court. "We concur with the trial court's

conclusion that reasonable persons could not have believed that

these witnesses provided an alibi for defendant or otherwise

materially aided the defense." (Resp. Ex. Ra2.)

"Whether rooted directly in the Due Process Clause of the

Fourteenth Amendment or in the Compulsory Process or

Confrontation clauses of the Sixth Amendment, the Constitution

guarantees criminal defendants 'a meaningful opportunity to

present a complete defense.'" Crane v. Kentucky, 476 U.S. 683,

690 (quoting California v. Trombetta, 467 U.S. 479, 485 (1984);

citations omitted). While "state and federal rulemakers have

broad latitude under the Constitution to establish rules

excluding evidence from criminal trials," United States v.

Scheffer, 523 U.S. 303, 308 (1998), the right to present a

complete defense is abridged by evidence rules that "infring[e]

upon a weighty interest of the accused" and that are "'arbitrary'

or 'disproportionate to the purposes they are designed to

serve,'" id. (citations omitted).

> The Compulsory Process clause protects the
> presentation of the defendant's case from unwarranted
> interference by the government, be it in the form of an
> unnecessary evidentiary rule, a prosecutor's
> misconduct, or an arbitrary ruling by the trial
> judge.[footnote]   ...
>
> But the right is not absolute.  The Sixth
> Amendment requires more than a mere showing by the
> accused that some relevant evidence was excluded from
> his trial.  Rather, the accused must show how that
> testimony would have been both material and favorable
> to his defense.   ...  [E]vidence is material: "only if
> there is a reasonable likelihood that the testimony
> could have affected the judgment of the trier of fact."
> ...  In [United States v. ]Bagley, [473 U.S. 667
> (1985)], the Court further refined the materiality
> definition by noting that, "[a] 'reasonable
> probability' is a probability sufficient to undermine
> confidence in the outcome."  Bagley, 473 U.S. at 682,
> 105 S.Ct. at 3383.
>
> In sum, for [a defendant] to establish that he was
> convicted in violation of his Sixth Amendment right to
> compulsory process, he must show: First, that he was
> deprived of the opportunity to present evidence in his
> favor; second, that the excluded testimony would have
> been material and favorable to his defense; and third,
> that the deprivation was arbitrary or disproportionate
> to any legitimate evidentiary or procedural purpose.
> Rock v. Arkansas, 483 U.S. 44, 56, 107 S.Ct. 2704,
> 2711, 97 L.Ed.2d 37 (1987).

Government of the Virgin Islands v. Mills, 956 F.2d 443, 445-46

(3d Cir. 1992) (footnote omitted).  The Court noted that some

courts analyze such claims under the Due Process Clause and that

there is little, if any, difference in the analysis. <u>Mills</u>, 956 F.2d at 445 n.4.

Here, the state courts found that the excluded alibi evidence was unlikely to be favorable to Petitioner, that it was not credible, and that it was not material to the outcome. In reaching this conclusion, the state courts considered the other evidence in the case, including Petitioner's confession and statements against interest to other witnesses.

The decision of the Appellate Division was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Petitioner is not entitled to relief on this claim.

C.   <u>Ineffective Assistance of Counsel</u>

Petitioner contends that his trial counsel was ineffective in failing to locate and subpoena his two alibi witnesses, in not challenging the jury array and the state's use of peremptory challenges, and in failing to request that the verdict be set aside pursuant to N.J.Ct.R. 3:18-2. Petitioner contends that his appellate counsel was ineffective in not adequately consulting with him and in not appealing the judgment on grounds of the jury array. (Resp. Ex. Ra11, incorporated in the Petition by reference.)

1.   Trial Counsel

The trial court rejected Petitioner's ineffective assistance claims.  (Resp. Ex. Ra28.)  The court found that a challenge to the jury panel for having an insufficient number of African/Americans would have been contrary to law.  The claim based upon counsel's failure to subpoena the two alibi witnesses was governed by the prior determination that the witnesses would not have been material to the defense.  Finally, the trial court found that there was no basis to set aside the verdict.  The Appellate Division agreed:

> The issue of trial counsel's failure to locate and subpoena the witnesses to testify at trial has already been decided by Judge Wertheimer and affirmed by this court.  The issue cannot be relitigated.  R. 3:22-5.

> The failure to challenge the jury array is nothing more than a bare allegation.  Defendant has to come forward with proofs to establish that the jury array was skewed.  State v. Cummings, 321 N.J. Super.  154, 168 (App. Div.), certif. denied, 162 N.J. 199 (1999). The showing to be made is formidable because there is a three-part test to satisfy.  State v. Ramseur, 106 N.J. 123, 215-16 (1987).  Defendant has to prove either an equal protection or fair cross section claim.  He first must identify a constitutionally cognizable group capable of being singled out for discriminatory treatment.  Second, under equal protection, he has to prove a substantial under-representation over a significant period of time.  Third, he must establish a discriminatory purpose either by a statistical showing or by demonstrating the use of racially non-neutral selection procedures to support the inference of discrimination raised by substantial under-representation.  Defendant's contention that the jury's race should have been challenged is wholly insufficient.

25

> Defendant claims that trial counsel's failure to
> request that the verdict be set aside pursuant to R.
> 3:18-2 constituted ineffective representation.   It
> would not have mattered had counsel made such a motion.
> Judge Wertheimer made it indelibly clear in his
> comments that such a motion if made, would have been
> denied.   Additionally, an independent review of the
> trial record shows that the proofs against defendant
> were exceedingly strong, well beyond those necessary to
> withstand a motion to set aside a verdict.

(Resp. Ex. Ra13 at 3-5, Opinion of Appellate Division, Oct. 24,

2002.)

The Counsel Clause of the Sixth Amendment provides that a

criminal defendant "shall enjoy the right ... to have the

Assistance of Counsel for his defence."   U.S. Const. amend. VI.

The right to counsel is "the right to _effective_ assistance of

counsel."   McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)

(emphasis added).

To prevail on a claim of ineffective assistance of counsel,

a habeas petitioner must show both that his counsel's performance

fell below an objective standard of reasonable professional

assistance and that there is a reasonable probability that, but

for counsel's unprofessional errors, the outcome would have been

different.   Strickland v. Washington, 466 U.S. 668, 687, 694

(1984).   A "reasonable probability" is "a probability sufficient

to undermine confidence in the outcome."   Strickland at 694.

Counsel's errors must have been "so serious as to deprive the

defendant of a fair trial, a trial whose result is reliable."

Id. at 687.   "When a defendant challenges a conviction, the

26

question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." Id. at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of Strickland. See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

As the trial court determined that the alibi witnesses would not have materially aided the defense, Petitioner cannot establish prejudice based upon trial counsel's failure to subpoena the witnesses.

With respect to Petitioner's complaint that there were not enough African-Americans on the jury, "The goal of the Sixth Amendment [right to trial by an impartial jury] is 'jury impartiality with respect to both contestants.'" George v. McCollum, 505 U.S. 42, 58 (1992) (quoting Holland v. Illinois, 493 U.S. 4784, 483 (1990)).  Thus, the Equal Protection Clause prohibits criminal defendants from exercising their peremptory strikes in a racially discriminatory manner.  Petitioner cannot establish any prejudice from trial counsel's failure to exercise his peremptory strikes in a racially discriminatory manner.  Nor has Petitioner established any constitutional deficiency with respect to the jury pool.

> The Equal Protection Clause of the Fourteenth Amendment requires the eradication of "racial discrimination in the procedures used to select the venire from which individual jurors are drawn." Batson v. Kentucky, 476 U.S. 79, 86, 106 S.Ct. 1712, 1717, 90 L.Ed.2d 69 (1986).  The Sixth Amendment requires that jurors be drawn from pools that represent a "fair cross-section" of the community.  "[J]ury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Duren v. Missouri, 439 U.S. 357, 363-64, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979) (quoting Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692,701, 42 L.Ed.2d 690 (1975)).

> The requirements a party must meet when challenging the jury selection process as being racially discriminatory are comparable under equal protection and fair cross-section analysis.  To prove either claim, a defendant must first identify a constitutionally cognizable group, that is, a group capable of being singled out for discriminatory treatment.  See Castaneda v. Partida, 430 U.S. 482,

494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977); <u>Duren</u>,
439 U.S. at 364, 99 S.Ct. at 668.  ...  African-
Americans are unquestionably a constitutionally
cognizable group.  ...

Second, to prove an equal protection violation,
the defendant must show that the cognizable group was
subject to "substantial underrepresentation" over a
significant period of time.  <u>See</u> <u>Castaneda</u>, 430 U.S. at
494, 97 S.Ct. at 1280.  The second requirement in a
Sixth Amendment challenge may differ somewhat in
application:  the defendant must show that the
representation of the cognizable group was not "fair
and reasonable in relation to the number of such
persons in the community."  <u>Duren</u>, 439 U.S. at 364, 99
S.Ct. at 668.

Finally, to prove an equal protection violation,
the defendant must show that the procedure which is
being used to select the jurors is "susceptible of
abuse or is not racially neutral."  <u>Castaneda</u>, 430 U.S.
at 494, 97 S.Ct. at 1280.  To succeed in a Sixth
Amendment challenge, the defendant need show only that
the underrepresentation was a result of systematic
exclusion of the group in the jury selection process.
<u>See</u> <u>Duren</u>, 439 U.S. at 364, 99 S.Ct. at 668.

<u>Ramseur v. Beyer</u>, 983 F.2d 1215, 1230-31 (3d Cir. 1992), <u>cert.</u>

<u>denied</u>, 508 U.S. 947 (1993).  Here, Petitioner has made only a

bare allegation that African-Americans were underrepresented on

his jury.  He has failed to present any evidence of either a

Sixth Amendment or Equal Protection violation in the composition

of the jury pool.  He has not established any prejudice based

upon trial counsel's failure to challenge the composition of the

jury pool.

Finally, with respect to trial counsel's failure to move to

set aside the verdict, the state courts found the evidence

against Petitioner exceptionally strong.  Petitioner cannot

establish the prejudice prong of an ineffective assistance claim with respect to this issue.

### 2. Appellate Counsel

Petitioner argues that appellate counsel was ineffective for failing to challenge the jury array. The Appellate Division rejected this claim.

> The challenge to appellate counsel's ineffectiveness was grounded on the same failure to challenge the jury array. Once again, defendant has failed to make the required showing. Moreover, appellate counsel is even further removed from trial counsel in terms of making the necessary record to raise the issue of an under-represented minority in the jury pool. Appellate counsel's focus is to address the record of the trial that has already been made.

(Resp. Ex. Ra13 at 5.)

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985). The Strickland standard for effective assistance of counsel applies to appellate counsel. See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while

30

pursuing issues that were clearly and significantly weaker," <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994).

Again, Petitioner has failed to present any evidence of a constitutional violation in either the composition of the jury pool or of the petit jury which convicted him.   Trial counsel could not constitutionally have exercise his peremptory challenges in a manner calculated to discriminate.   Petitioner has failed to establish any error by appellate counsel.

The decision of the Appellate Division with respect to both trial and appellate counsel was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.   Petitioner is not entitled to relief on this claim.

D.   <u>Prosecutorial Misconduct</u>

Petitioner contends that he was denied due process "when prosecutor exceeded all bounds of fair play in summation."   (Pet. at ¶ 12E.)   The Appellate Division rejected this claim.

> Defendant asserts for the first time on appeal
> that he was denied a fair trial by virtue of certain
> remarks made by the prosecutor during her cross-
> examination of him and during her closing argument.   He
> claims this "ridicule and name-calling ... was
> inappropriate and grossly inflammatory" and thus
> prejudiced the jury against him.   Because these
> statements were not objected to at trial, the potential
> error should be reviewed under the plain error
> standard, R 2:10-2.

Defendant claims the "pattern of ridicule and
name-calling" began with the following exchange:

> Prosecutor:   But as far as getting along
> with [Traci Thomas], you didn't have angry
> words around the time of your arrest, did
> you?
>
> Defendant:    No.
>
> Prosecutor:   Okay.  You didn't have a
> fistfight with her around the time of your
> arrest, did you?
>
> Defendant:    I don't hit girls.  So I walk
> away.
>
> Prosecutor:   You just shoot people in the
> back?
>
> Defendant:    See, that's dirty.  No I don't
> shoot people.

Defendant contends this "pattern" continued with
several comments the prosecutor made during her closing
argument.  First, he alleges that the prosecutor
implied that defendant did not take his oath seriously
when he testified.  The context of the disputed
sentence is:

> Don't forget Shannelle Diggs is related
> to one of the co-defendants in this case.  If
> she had a motive to lie, ladies and
> gentlemen, she would.  But when she took the
> oath in this case, she took it serious,
> unlike Mr. Moore, which I will get into ...

Defendant then points to three incidents when he was
called either a "killer" or a "sociopath with a gun."
Speaking of Kyewaghana Cook, the prosecutor stated:

> Do you remember when Kyewaghana
> testified?  Do you remember how we actually
> had to wait for her to come out of the back
> room.  She is sixteen years old.  She lives
> in one of the worst sections of Plainfield
> that you can imagine and she knew that guy.
> She knew on that night <u>she knew the face of</u>

32

<u>that killer</u> and if anything should show you
how certain she is of her [sic] identity, she
couldn't come out here and do it.

   She, ladies and gentlemen, is petrified
and can you blame that sixteen year-old girl?
You know she had contact with him.  She was
talking to them.  Jada [Williams, another of
the girls defendant allegedly spoke with in
Plainfield] said it, Khahlia said it and even
the defendant in his statement admits that.
So if anything should prove to you the
accuracy of the identity of the case it's not
so much what Kyewaghana said, it's how she
acted.  <u>She didn't want to face that killer
again</u>.

[Emphasis added.]

Finally, defendant objects to a comment made while the
prosecutor was reviewing his alleged statement, "I was
telling the fat guy to tell his boy to put the gun
down.  I was asking about what he put in the trunk."
The prosecutor then added:

   That's interesting.  You know what that is.
   That is probably them seeing Marcus going to
   the trunk, putting his money there when he
   was riding around.  "He told me it wasn't his
   car."  That's probably why Marcus got shot.
   He probably said to Marcus is that your car
   and Marcus probably said, no, it's not my
   car.  <u>Probably angered this sociopath with
   the gun</u>.

[Emphasis added.]

   "So long as [the prosecutor] stays within the
evidence and the legitimate inferences therefrom the
Prosecutor is entitled to wide latitude in his
summation."   ...  Improper prosecutorial comment
"requires reversal where the conduct 'was so egregious
that it deprived defendant of a fair trial.'"   ...
According to <u>Setzer</u>, factors to consider when
determining whether a comment requires reversal
include:  (1) "whether defense counsel timely and
properly objected to the remarks;" (2) "whether the

remark was withdrawn promptly;" and (3) "whether the court gave the jury curative instructions." ...

Here, although the remarks were not withdrawn and no curative instruction given, defense counsel failed to make a timely objection. Thus, this court is faced with the same situation as in Setzer, and must determine, as noted above, whether the failure to correct the comments constituted plain error. In Setzer, the prosecutor was alleged to have made only one improper statement. Ibid. Nevertheless, the court there found it significant that "the trial court below instructed the jurors that statements by counsel are not evidence." Ibid. The judge here gave similar instructions, both at the very beginning of the case and during his final instructions.

There are several reasons why there was no plain error here. First, there was nothing improper about the prosecutor asking defendant if he committed this crime. Indeed, far from being improper, the question was an attempt on cross-examination to force defendant to admit his guilt. Though the question may have been a sarcastic one, it was a proper subject of cross-examination.

Second, the prosecutor did suggest that defendant lied during his testimony. However, the State's entire case was predicated upon this notion. If defendant were telling the truth, the State would have no case. It was the prosecutor's duty to demonstrate that defendant did not tell the truth. Suggesting she would show defendant did not take his oath seriously was thus fair comment.

Third, the prosecutor twice said Kyewaghana Cook recognized defendant as the killer, and so was scared to testify. Arguably, this is not a comment at all. Rather, the prosecutor was explaining to the jury that th witness was scared to testify because she did not want to face a person she believed to be a killer. Even if the prosecutor was calling defendant a "killer," the remark was still not egregious. That was the charge against defendant in this case, and the evidence, including defendant's confession, clearly suggested defendant was a killer. We see no error.

34

> Lastly, there is the comment that Marcus Benjamin
> "[p]robably angered this sociopath with the gun."
> While there was no evidence that defendant was a
> "sociopath," it is evident that even this comment at
> worst is harmless error.  Defendant points to two cases
> in which he alleges that prosecutorial "name-calling"
> warranted reversal.  In each case, however, it was a
> combination of errors that led to the reversal, and not
> just the improper comments.  ...  Not every improper
> comment leads to reversal. ...

(Resp. Ex. Ra1 at 20-24.)

The U.S. Supreme Court has recognized the obligation of a

prosecutor to conduct a criminal prosecution with propriety and

fairness.

> He may prosecute with earnestness and vigor - indeed,
> he should do so.  But, while he may strike hard blows,
> he is not at liberty to strike foul ones.  It is as
> much his duty to refrain from improper methods
> calculated to produce a wrongful conviction as it is to
> use every legitimate means to bring about a just one.
> ...  Consequently, improper suggestions, insinuations,
> and, especially, assertions of personal knowledge are
> apt to carry much weight against the accused when they
> should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).  "The line

separating acceptable from improper advocacy is not easily drawn;

there is often a gray zone.  Prosecutors sometime breach their

duty to refrain from overzealous conduct by commenting on the

defendant's guilt and offering unsolicited personal views on the

evidence."  United States v. Young, 470 U.S. 1, 7 (1985).

> The prosecutor's vouching for the credibility of
> witnesses and expressing his personal opinion
> concerning the guilt of the accused pose two dangers:
> such comments can convey the impression that evidence
> not presented to the jury, but known to the prosecutor,
> supports the charges against the defendant and can thus

35

jeopardize the defendant's right to be tried solely on
the basis of the evidence presented to the jury; and
the prosecutor's opinion carries with it the imprimatur
of the Government and may induce the jury to trust the
Government's judgment rather than its own view of the
evidence.

Id. at 18.

Under U.S. Supreme Court precedent, where a prosecutor's
opening or closing remarks are challenged in habeas, "[t]he
relevant question is whether the prosecutor's comments 'so
infected the trial with unfairness as to make the resulting
conviction a denial of due process.'"  Darden v. Wainwright, 477
U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S.
637 (1974)).  In evaluating the likely effect of improper
comments, a court may consider whether the improper comments were
invited by or responsive to prior comments by opposing counsel.
Darden, 477 U.S. at 181-82.  Thus, "Supreme Court precedent
counsels that the reviewing court must examine the prosecutor's
offensive actions in context and in light of the entire trial,
assessing the severity of the conduct, the effect of the curative
instructions, and the quantum of evidence against the defendant."
Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

Here, the Appellate Division identified the appropriate
standard and determined that the prosecutor's comments either
were not objectionable or did not rise to the level of unfairness
that would have deprived Petitioner of due process.  The decision
of the Appellate Division was neither contrary to, nor an

36

unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

E.   <u>Excessive Sentence</u>

Petitioner contends that his sentence of life imprisonment followed by a consecutive 20-year term with a total of 40 years of parole ineligibility is excessive and unconstitutional.  The Appellate Division rejected this claim on state law grounds.

A federal court's ability to review state sentences is limited to challenges based upon "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies."  <u>See</u> <u>Grecco v. O'Lone</u>, 661, F.Supp. 408, 415 (D.N.J. 1987) (citation omitted).  Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation.  <u>See</u> <u>Pringle v. Court of Common Pleas</u>, 744 F.2d 297, 300 (3d Cir. 1984).  <u>See also</u> 28 U.S.C. § 2254(a); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991); <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990).

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"  <u>Ewing v. California</u>, 538 U.S. 11, 20 (2003) (citations omitted).  The Supreme Court has

37

identified three factors that may be relevant to a determination of whether a sentence is so disproportionate to the crime committed that it violates the Eighth Amendment:  "(1) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." Solem v. Helm, 463 U.S. 277, 292 (1983).  More recently, Justice Kennedy has explained that Solem does not mandate comparative analysis within and between jurisdictions, see Harmelin v. Michigan, 501 U.S. 957, 1004-05 (Kennedy, J., concurring in part and concurring in judgment), and he has identified four principles of proportionality review--"the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors"--that "inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime," id. at 1001 (citation omitted) quoted with approval in Ewing, 538 U.S. at 23.

Here, Petitioner committed a murder, attempted murder, robbery and related offenses.  He has presented no cogent argument why his life sentence is unconstitutional.  This Court finds that Petitioner's sentence is not "grossly

38

disproportionate" to the crimes he committed.  Petitioner is not entitled to relief on this claim.

### IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

### V.  CONCLUSION

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.

S/William H. Walls
United States District Judge

Dated:

39